**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

JAMAR SULLIVAN,

                                        Plaintiff,

            v.                                                      No. 09-CV-1311
                                                                        (TJM/DRH)

HAROLD D. GRAHAM, Superintendent,
Auburn Correctional Facility; T. HARTE,
Correctional Officer, Auburn Correctional
Facility; and SULLIVAN, Correctional
Officer, Auburn Correctional Facility,

                                        Defendants,
_____

**APPEARANCES:**                         **OF COUNSEL:**

JAMAR SULLIVAN
Plaintiff Pro Se
99-B-0445
Elmira Correctional Facility
Post Office Box 500
Elmira, New York 14902

HON. ERIC T. SCHNEIDERMAN              AARON M. BALDWIN, ESQ.
Attorney General for the               Assistant Attorney General
  State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

      Plaintiff pro se Jamar Sullivan ("Sullivan"), an inmate in the custody of the New York

State Department of Correctional Services ("DOCS"), brings this action pursuant to 42

_____

      [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

U.S.C. § 1983 alleging that defendants, a DOCS Superintendent and two corrections officers, violated his constitutional rights under the Eighth Amendment.  Compl. (Dkt. No. 1). Presently pending is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56.  Dkt. No. 33.  Sullivan opposes the motion.  Dkt. No. 36.  For the following reasons, it is recommended that defendants' motion be granted.

## I. Background

The facts herein are related in the light most favorable to Sullivan as the non-moving party.  See subsection II(A) infra.

### A. May 5, 2009

On May 5, 2009 at approximately 9:30 p.m., after a visit to the law library, Sullivan waited in the main recreation yard at Auburn Correctional Facility ("Auburn") for return to his cell.[2]  Dkt. No. 33-11 at 22; Dkt. No. 33-13 at 7-8; Sullivan Dep. (Dkt. No. 33-15) at 36.  He was among approximately 200 other inmates who were also in the main yard.  Dkt. No. 33-9 at 19; Harte Decl. (Dkt. No. 33-17) ¶ 17; Sullivan Decl. (Dkt. No. 33-18) ¶ 17.  Sullivan was not pat-frisked or scanned with any metal detection device that evening.  Sullivan Dep. at 36.  Sullivan also did not observe other inmates being frisked or scanned on a regular basis, despite the availability of metal detection devices in the prison.  Sullivan Dep. at 38-40.

---

[2] In the complaint, Sullivan indicated that he entered the main yard from his housing unit.  Compl. ¶ 6.  However, in his deposition he stated that entered from the law library. Sullivan Dep. at 45-46.

Defendant Harte, a corrections officer, was working the 3 p.m. to 11 p.m. shift as a combined escort and post officer.  Harte Decl. (Dkt. No. 33-17) ¶ 5.  Defendant Sullivan, also a corrections officer, was also working the 3 p.m. to 11 p.m. shift as an escort officer. Sullivan Decl. (Dkt. No. 33-18) ¶ 5.  Harte was responsible for "escorting individuals to and from the recreation yard to other areas of the facility . . . and to supervise inmates in the main recreation yard when not performing escort duties."  Harte Decl.  ¶ 6.  Sullivan had similar job responsibilities, including escorting inmates and assisting other officers on duty in performing their supervisory tasks.  Sullivan Decl. ¶ 6.  During this shift, both Harte and Sullivan "observed various correction officers perform routine random pat frisks and metal detection searches with wands of inmates entering the main recreation yard."  Harte Decl. ¶ 7; Sullivan Decl. ¶ 7.  Harte also saw metal detection searches of inmates already inside the yard.  Harte Decl. ¶ 7.  Both defendants also "personally performed patrols of the yard and routine random pat frisks of inmates in the yard during the times . . . ." they were not otherwise performing their above stated escorting duties.  Harte Decl.  ¶ 8; Sullivan Decl. ¶ 8.

While in the main yard, Sullivan saw an inmate he knew approached another inmate, and engaged in conversation.  Compl.  ¶ 6; Dkt. No. 33-11 at 22; Dkt. No. 33-13 at 8.  The inmate showed Sullivan information in a book, so Sullivan's eyes were looking down and his attention was focused on the book and their conversation.  Compl. ¶ 6; Dkt. No. 33-11 at 20-23; Dkt. No. 33-13 at 8; Sullivan Dep. at 49, 53-54.  Sullivan then felt something cut his face.  Compl. ¶ 6; Dkt. No. 33-11 at 21.  Sullivan did not see the inmate who had cut him.[3]

_____

[3] Inmate Austin was seen making slashing motions from behind Sullivan, and also threw the weapon that was recovered.  Dkt. No. 33-9 at 1, 17, 19, 20; Dkt. No. 33-11 at

Dkt. No. 33-9 at 33; Dkt. No. 33-13 at 8, 10-11; Sullivan Dep. at 43, 53, 66.  Sullivan looked

up from the book and scanned the crowd of inmates also in the main yard.  Dkt. No. 33-11

at 21; Dkt. No. 33-13 at 9.  Sullivan saw someone walking away from him who looked

suspicious, so Sullivan approached the inmate, later identified as inmate Hill.  Compl. ¶ 6;

Dkt. No. 33-11 at 21; Dkt. No. 33-13 at 9, 11; Sullivan Dep. at 56. Sullivan then engaged in

a brief fist fight with Hill.  Compl. ¶ 6; Dkt. No. 33-9 at 17; Dkt. No. 33-11 at 21; Dkt. No. 33-

13 at 9, Sullivan Dep. at 56.

Multiple corrections officers saw Sullivan and Hill exchanging punches, approached

them, and ordered them to stop fighting.  Dkt. No. 33-9 at 17, 19, 25; Harte Decl. ¶¶ 18-19;

Sullivan Decl. ¶ 21-22.  Harte and Sullivan were among the officers who responded to the

fight.  Dkt. No. 33-9 at 25; Sullivan Dep. at 59; Harte Decl. ¶ 18; Sullivan Decl. ¶¶ 18, 20.

The fight lasted less than one minute.  Sullivan Dep. at 56-58; Harte Decl. ¶¶ 22, 26;

Graham Decl. (Dkt. No. 33-16) ¶ 98; Sullivan Decl.  ¶¶ 20, 25.  Sullivan testified that

corrections officers were not far from him when the altercation began.  Sullivan Dep. at 50-

51.  No force was used by the corrections officers to terminate the fight.  Dkt. No. 33-9 at

17;  Sullivan was taken to the infirmary, and then an outside hospital[4], for treatment of a six

inch gash in his cheek.  Compl. ¶ 6; Dkt. No. 33-9 at 22, 28-29; Dkt. No. 33-10; Sullivan

_____

13-14; Harte Decl. ¶ 20.  Sullivan claimed that he was cut before the fight (Sullivan Dep. at
54, 64, 66), though the Unusual Incident Report and Corrections Officers' memorandum
indicate that Sullivan was cut while he was fighting with Hill (Dkt. No. 33-9 at 1).  It is
agreed by all parties though, that Sullivan received a laceration which required outside
medical care on his cheek after getting cut by a razor blade.

[4] While being treated in the outside hospital, Sullivan heard a nurse speaking with
an unidentified corrections officer about another inmate who had been involved in a similar
incident earlier in the evening.  Sullivan Dep. at 11.  Sullivan had no further information
about the identities, time or place of the occurrence.  Id. at 11-12.

Dep. at 8-11; Dkt. No. 36 at 83, 86.  The laceration ultimately required twenty-nine sutures. Compl. ¶ 6; Dkt. No. 33-9 at 2[5], 19, 28-29; Sullivan Dep. at 17.

Corrections Officers Talbot and Smith also observed another inmate, later identified as inmate Austin, throw an object on the ground. Dkt. No. 33-9 at 1, 19, 20.  Another inmate, later identified as inmate James picked up the object and attempted to flee.  Dkt. No. 33-9 at 1, 20.  Officer Talbot ordered James to stop, which he did, and the object was recovered. Dkt. No. 33-9 at 1, 17, 20; Harte Decl. ¶ 24.  The object, a razor blade which had been melted into a toothbrush, was approximately two inches long and was presumed to be the weapon used to lacerate Sullivan's face.  Dkt. No. 33-9 at 1, 17, 20; Dkt. No. 33-10 at 2; Harte Decl. ¶ 24.

All inmates involved in the altercation were given misbehavior reports and Sullivan was ultimately given a ninety-day sentence in the Special Housing Unit ("SHU")[6].  Compl. ¶ 6; Dkt. Nos. 33-6; 33-9 at 34-38; Sullivan Dep. at 6, 22-23.   Sullivan knew inmate Austin, because they were housed together, but never indicated that he and Austin had any problems.  Sullivan Dep. at 16-17.  Sullivan did not know any of the other inmates involved in the altercation prior to its occurrence.  Sullivan Dep. at 15-16.  Sullivan was not aware of any threat or danger to his health or well-being prior to the altercation.  Dkt. No. 33-9 at 18,

---

[5] Dkt. No. 33-9 at 1-5 is a copy of the Unusual Incident Report.  Additional copies of this report, stating substantially the same information, are also included.  See Dkt. No. 33-9 at 6-16.  Citations will only be made to pages 1 through 5.

[6]SHUs exist in all maximum and certain medium security facilities.  The units "consist of single-occupancy cells grouped so as to provide separation from the general population . . . ."  N.Y. Comp. Codes R. & Regs. tit. 7, § 300.2(b).  Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required.  Id. at pt. 301.

33; Dkt. No. 33-11 at 22; Dkt. No. 33-13 at 12-13; Sullivan Dep. at 7, 55, 61-63, 67-69.

Defendants were also unaware of any potential threat to Sullivan's health or well being.

Graham Decl. ¶¶ 101, 104-05.[7]  Sullivan made no complaints about the security measures,

or perceived lack thereof, prior to the incident.  Sullivan Dep. at 70.


### B. Security Procedures at Auburn

Inmates are allowed approximately one hour of recreation time in one of two

locations, the main yard and the south yard.  Graham Decl. (Dkt. No. 33-16) ¶¶ 10-11.  The

main yard holds between 100 to 400 inmates at a time.  Id.  ¶ 11.  "The main recreation

yard is utilized and/or traversed by roughly ninety percent . . . of the general population

inmates at Auburn multiple times per day.  In addition to recreation, general population

inmates go through the main recreation yard for all movement to/from housing blocks for

programs, visits, call-outs, medical, etc. . . . ."  Id.  ¶ 13.  Inmates may gain access to the

main yard through one of six different locations.  Id.  ¶ 14.

A range of efforts are undertaken to ensure that contraband does not enter the main

yard.  First,

> a greater amount of staff are assigned to supervise inmates in the
> main yard . . . Specifically, security staff are assigned to eight . . .
> fixed stations or guard "posts" . . ., are also assigned to "float" in
> and around the main yard, to be escorts for inmates . . . , and
> armed guards are assigned to two . . . gun towers above the main
> yard . . . The towers include a separately staffed video monitoring
> location through which inmates are observed by way of four . . .
> cameras . . . .

---

[7] None of the other inmates involved in the altercation had a history of violence
while in prison, had any known enemies, or had a record of unauthorized gang activity.

6

Graham Decl. ¶ 17.  These officers are trained to observe inmates and make patrols of the

area, "recogniz[ing] any change in their demeanor which would give rise to the need for

intervention by staff . . . ." and given permission to "perform routine random pat frisks and

routine random metal detection searches . . . ."  Id.  ¶¶ 19-20; see also Harte Decl. ¶¶ 9, 11

(explaining how he is trained to observe and evaluate changes in inmate behavior); Sullivan

Decl. ¶¶ 9, 11 (same).  However, each inmate "is not frisked, searched, or subject to metal

detection on his way into the main recreation yard," because metal detection and pat frisk

searches are discretionary when inmates are going to and returning from housing and

program areas.  Graham Decl. ¶¶ 21-23; see also Dkt. No. 33-5 at 2 (explaining the

circumstances under which an inmate may be subjected to a metal detection search).  This

is because there are various other security protocols including that (1) staff are permitted to

undertake both routine and special unannounced searches of all facility areas in an attempt

to eliminate contraband; (2) the main yard is swept by staff when inmates are not present to

ensure no contraband is hidden in the yard; (3) inmates are not allowed to congregate in

groups of six or more unless they are engaged in certain approved recreational activities

such as sports; and (4) inmates are only permitted to bring certain things into the yard.

Graham Decl. ¶¶ 24-25, 27, 29-35.  Additionally, inmates have limited access to metal

items and the other types of items that they may possess in their cells.  Id.  ¶ 41.

"Even with all these precautions . . . inmates find incredibly creative ways to possess

contraband and fashion crude weapons . . . which cannot be detected with the use of metal

detectors."  Graham Decl. ¶ 49.  "Inmates also hide such weapons in their body cavities

which cannot be effectively detected with metal detectors or through pat frisks."  Id.  ¶ 50.

Mandating walk through metal detectors prior to entering the main yard "would be near

impossible and highly impractical [because] . . . the facility . . . does not have enough staff to effectively and efficiently search such a large number of inmates multiple times a day [and] . . . given the number of inmates at Auburn . . . mandatory searches of every inmate . . . would effectively deprive inmates of recreation." Id. ¶¶ 36-37.  Moreover, "Not only does the facility lack funding to put in place numerous [metal detectors] . . . but . . . [the] detectors would be especially difficult to keep properly calibrated . . . near the entrances to the main yard given the large amount of steal [nearby] . . . ." Id. ¶ 38.  Even if the funding difficulties were resolved and a walk through metal detector could be placed at one entrance for all inmates to egress through, "inmates would then have to effectively be funneled through the facility to a centralized yard entrance which would then pose . . . perhaps greater safety and security risks due to congestion and movement by inmates into areas where the could not otherwise . . . be present." Id. ¶ 39.

On the evening of May 5, 2009, there were seventeen officers assigned to the various security positions in the Auburn main yard.  Graham Decl. ¶ 18.  While performing their various security duties, neither Harte nor Sullivan saw "any activity by inmates . . . that could have served as a warning the [Sullivan] was going to be assaulted at about 9:30 p.m." Harte Decl. ¶ 9; Sullivan Decl. ¶ 9.  Also, at no time prior to the incident did Sullivan let defendants know "that he feared for his safety or that he had any reason to believe a problem was imminent."  Harte Decl. ¶ 12; Sullivan Decl. ¶ 12.


## C. History of Violence at Auburn

While Sullivan was incarcerated at Auburn, other inmates had told him that fights where people had been cut occurred frequently in the yard.  Sullivan Dep. at 14-15, 64-65.

Auburn is a maximum security facility and, thus, "the majority of the inmates at Auburn . . . have some history of violence or other anti-social behaviors."  Graham Decl. ¶ 8.  Thus, "despite the best and reasonable efforts of staff, some modicum of inmate on inmate violence with contraband weapons is an unfortunate but inescapable reality."  Id.  ¶ 51.

From 2007 through May of 2009, there were twenty incidents of inmate-on-inmate violence in the main yard.  Graham Decl.  ¶¶55-60; see also Dkt. No. 33-7 (copies of Unusual Incident Reports generated in conjunction with incidents of inmate violence in the main yard); Dkt. No. 36 at 1-80 (copies of all Unusual Incident Reports throughout Auburn generated in connection with inmate on inmate violence provided to Sullivan through course of discovery).[8]  Of those twenty instances, sixteen involved the use of a contraband weapon.  Graham Decl. ¶ 61.  Graham did not view those numbers as an indication that the security measures being undertaken at Auburn were insufficient or that inmates were subjected to a substantial risk of harm while engaging in recreation.  Id.  ¶¶ 61-62.  Graham was the only named defendant able to make decisions related to the security protocols and procedures.  Harte Decl. ¶ 16; Sullivan Decl. ¶16.

Earlier on the evening of May 5, there was another fight at Auburn, but neither inmate was injured with a contraband weapon.  Graham Decl.  ¶ 64.  About an hour before Sullivan was injured, a fist-fight erupted between two inmates in the main yard.  Graham Decl. ¶ 64.  The inmates involved in this fight, and its purpose, had no connection to Sullivan's assault.  Graham Decl. ¶¶ 65-66.

---

[8] There were also seventeen instances of inmate on inmate violence in the other recreation yard, the south yard, in the same time period.  Graham Decl. ¶ 58, n.1.

9

## III.  Discussion

In his complaint, Sullivan alleges that his Eighth Amendment rights were violated when

defendants failed to protect him from the random attack by failing promptly to respond and

by failing to require that inmates pass through the metal detectors and be pat frisked prior

to entering and exiting the recreation yard.  Defendants move for summary judgement on all

claims asserting that Sullivan cannot recover against defendants (1) in their official

capacities, (2) because his constitutional claims lack merit, and (3) because they are

entitled to qualified immunity.


## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any

material fact if supported by affidavits or other suitable evidence and the moving party is

entitled to judgment as a matter of law. The moving party has the burden to show the

absence of disputed material facts by informing the court of portions of pleadings,

depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; Celotex Corp. v.

Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the

case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248

(1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the

non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue

for trial. The non-moving party must do more than merely show that there is some doubt or

speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could

find in favor of the non-moving party for a court to grant a motion for summary judgment.

Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v.

Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must

afford the non-movant special solicitude.  Triestman v. Fed. Bureau of Prisons, 470 F.3d

471, 477 (2d Cir. 2006).  However, the mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no genuine issue of material fact.  Anderson, 477

U.S. at 247-48.


### B. Eleventh Amendment

Sullivan sues the defendants in both their individual and official capacities.  The

Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be

construed to extend to any suit in law or equity, commenced or prosecuted against one of

the United States by Citizens of another State, or by Citizens or Subjects of any Foreign

State."  U.S. Const. amend. XI.  "[D]espite the limited terms of the Eleventh Amendment, a

federal court [cannot] entertain a suit brought by a citizen against his [or her] own State."

Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) (citing Hans v.

Louisiana, 134 U.S. 1, 21 (1890)).  Regardless of the nature of the relief sought, in the

absence of the State's consent or waiver of immunity, a suit against the State or one of its

agencies or departments is proscribed by the Eleventh Amendment.  Halderman, 465 U.S.

at 100.  Section 1983 claims do not abrogate the Eleventh Amendment immunity of the

states. See Quern v. Jordan, 440 U.S. 332, 340-41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official.  Farid v. Smith, 850 F.2d 917, 921 (2d Cir. 1988) (citing Edelman v. Jordan, 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. Kentucky v. Graham, 473 U.S. 159, 166 (1985). Here, Sullivan seeks monetary damages against defendants in their official capacities for acts occurring within the scope of their duties with DOCS.  Thus, the Eleventh Amendment bar applies and serves to prohibit Sullivan's claim for monetary damages against the individual defendants in their official capacities.

Accordingly, it is recommended that defendants' motion be granted on this ground and that judgment be granted to all defendants as to Sullivan's claims against them in their official capacities.

**C. Eighth Amendment**[9]

Eighth Amendment obligations include the duty to protect prisoners from other known

harms.  Farmer v. Brennan, 511 U.S. 825, 829 (1970).   "The Constitution does not

mandate comfortable prisons but neither does it permit inhumane ones, and it is now

settled that the treatment a prisoner receives in prison and the conditions under which he is

confined are subject to scrutiny under the Eighth Amendment."  Id. at 832.  Where the

inmate is alleging "a failure to prevent harm, the inmate must show that he is incarcerated

under conditions posing a substantial risk of serious harm."  Id. at 834 (citing Helling v.

McKinney, 509 U.S. 25, 31-32 (1993)).

As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . .

and subjective test."  Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted).

In order to state a cognizable failure to protect claim, (1) "the inmate [must be] incarcerated

under conditions imposing a substantial risk of serious harm," and (2) the prison official

must "know of and disregard an excessive risk to inmate health and safety; the official must

---

[9] Sullivan bases his Eighth Amendment claim on a violation of defendants' duty to "active[ly] supervise."  Compl. ¶ 7.  "Active Supervision" is part of a provision designed for the management of county jails, not state correctional facilities.  N.Y. Comp. Codes R. & Regs. tit. 9, § 7003 et seq.; see also Sanchez v. State of New York, 803 N.Y.S.2d 21, *6 (N.Y. Ct. Cl. 2005) ("[T]he 'active supervision' requirement is inapplicable to State correctional facilities.").  Moreover, an action commenced pursuant to 42 U.S.C. § 1983 requires proof of the "deprivation of any right[], privilege[], or immunit[y] secured by the Constitution" or laws of the federal government.  42 U.S.C. § 1983.  Thus, no action lies under § 1983 unless a plaintiff has asserted the violation of a federal right.  See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 19 (1981). While unable to allege a failure of active supervision claim, liberally construing Sullivan's complaint, he has alleged an Eighth Amendment failure to protect claim.

13

both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Matthews v. Armitage, 36 F. Supp. 2d 121, 124-25 (N.D.N.Y. 1999) (citing Farmer, 511 U.S. at 834) (internal citations and quotation marks omitted).  Where a plaintiff alleges a constitutional violation based on dangerous general prison conditions, there must be demonstrated a "substantial risk of inmate attacks [which were] longstanding, pervasive, well-documented, or expressly noted by prison officials . . . and that the officials being sued were exposed to information concerning the risk and thus, must have known about it." Madison v. Hoey, No. 03-CV-749 (FJS/GJD), 2009 WL 818956, at *8 (N.D.N.Y. Mar. 26, 2009) (citations omitted).  "Thus, the court must analyze [such] case[s] both as it relates to a specific danger to plaintiff as well as a danger to the inmate population in general." Id.

In this case, defendants do not deny that the laceration which Sullivan received constitutes a serious harm.  However, they do argue that Sullivan offered no evidence to satisfy the subjective prong of the test.  First, all parties agree that Sullivan had no advance knowledge of the attack, did not know most of the inmates who assaulted him, had no fear of being assaulted, and did not think that he was in any danger or had any conflicts with any other inmate prior to the attack.  Sullivan Dep. at 15-17, 55, 61-63, 67-69; Graham Decl. ¶¶ 101, 104-05.  Thus, neither Sullivan nor the defendants were specifically aware that Sullivan was at risk of serious danger or harm.  There were also no indications from which a reasonable officer could have drawn an inference that Sullivan may have been in danger.  Furthermore, the occurrence of an unrelated fist fight between two completely different inmates earlier in the evening was also insufficient to serve as any sort of notice to corrections officers that Sullivan was in danger of injured by a different inmate later that

evening.  Hoey, 2009 WL 818965, at *9 ("[E]ven if there had been an attack earlier the same day in another part of the prison, there is absolutely no connection to a specific danger or any danger to the plaintiff.")

   Moreover, nothing in the record supports Sullivan's claim that defendants Harte and Sullivan failed to intervene promptly.  By all accounts, including Sullivan's own deposition testimony, there was no warning that an attack was about to occur and the entire duration of both the razor blade attack and fist fight was less than a minute.  Sullivan Dep. at 50-51, 56-58; Harte Decl. ¶¶ 22, 26; Graham Decl. ¶ 98; Sullivan Decl. ¶¶ 20, 25.  Sullivan testified that everything occurred very quickly during the incident.  Sullivan Dep. at 50-51, 56-58. Both defendants recount that they responded immediately and that the entire event was over n approximately thirty seconds.  Harte Decl. ¶¶ 22, 26; Graham Decl. ¶ 98; Sullivan Decl. ¶¶ 20, 25.  The video tape supports this recitation of the facts.  Dkt. No. 33-14, Ex. L. Accordingly, given the "seriously time-limited opportunity [Sullivan possessed] to have witnessed the movements of the other inmate and of the defendants . . . ." any contentions Sullivan proffers indicating that defendants were untimely in their reactions is belied by the record.  Dexter v. Thompson, No. 93-CV-0745E(F), 1995 WL 495072, at *5 (W.D.N.Y. Aug. 18, 1995); see also Villante v. Vandyke, No. 04-CV-759 (FJS/DRH), __ WL __, p. 3 (N.D.N.Y. Sept. 30, 2010) (Dkt. No. 33-20 at 40) ("Such an immediate response [within 20 seconds after the fight started] clearly does not show deliberate indifference.") (citations omitted); Zimmerman v. Macomber, No. 95-CV-882(DAB), 2001 WL 946383, at *5 (S.D.N.Y. Aug. 21, 2001) ("Courts routinely deny deliberate indifference claims based upon surprise attacks.") (citing cases).

15

Additionally, Sullivan's claims that, because violent attacks occurred in the recreation area defendants should always have been using the metal detectors, is unavailing.[10] See Warren v. Goord, 476 F. Supp. 2d 407, 411 (S.D.N.Y. 2007) (hereinafter Warren I) (discussing case in which inmate alleged failure to protect due to failure to install metal detectors  whereupon summary judgment would have been avoided had the inmate "made specific allegations as to the level and type of previous violence in the yard and whether it was serious and similar enough to put defendants on notice of the substantial risk of danger.") (citations omitted).  To proffer such a claim sufficiently, plaintiff must establish facts that "there were numerous other inmate-on-inmate attacks . . . ; the attacks posed a substantial risk of harm to inmates; the defendants knew about these attacks; . . . despite their knowledge . . . , failed to take steps to reduce the harm;" and that had defendants engaged in remedial actions it would have reduced the risk or harm so that the attack would not have occurred.  Hoey, 2009 WL 818956, at *8; see also Warren v. Goord, 579 F. Supp. 2d 488, 495-96 (S.D.N.Y. 2008) (hereinafter Warren II) (discussing elements of a culpable state of mind required to establish deliberate indifference in a failure to protect case) aff'd 368 Fed. Appx. 161 (2d Cir. 2010).

Here, there were sixteen attacks on inmates with contraband weapons in the main recreation yard in the thirty months preceding the current attack.  Graham Decl. ¶¶ 55-60. Combining the figures of attacks for both recreation yards results in the occurrence of thirty-three attacks in thirty months.  See n.8 supra.  Another court has held that thirty-seven

---

[10]Neither defendant Harte nor Sullivan possessed the authority to amend or modify the security procedures and protocols.  Harte Decl. ¶ 16; Sullivan Decl. ¶16.  Thus, the decision whether to use the metal detector was not a decision which either controlled or in which either was involved.

attacks in a four-year period was sufficient to establish a history of inmate-on-inmate violence giving notice to prison authorities of the danger to inmates from such attacks. Warren II, 579 F. Supp. 2d at 495-96.  Therefore, construing the facts in the light most favorable to Sullivan, he has demonstrated that there is a material question of fact regarding a history of inmate violence at Auburn and notice of the danger of such attacks known to defendants.

However, even crediting Sullivan's complaint and accepting that these numbers suffice to defeat defendants' motion regarding notice, "[a] prison office does not act with deliberate indifference unless, in addition to knowing of a risk to an inmate, he or she disregards that risk by failing to take reasonable measures to abate it."  Warren II, 579 F. Supp. 2d at 496 (internal quotation marks and citations omitted).  Thus, "[t]o prevail, a plaintiff must show that the prison officials had the ability to take some reasonable action that would have significantly alleviated the risk yet failed to do so."  Id. (internal quotation marks and citations omitted).  Sullivan has failed to establish that defendants did not act reasonably in establishing their security protocols or proffer any evidence that defendants could have taken other action to decrease meaningfully the risk of inmate assaults.

Defendants provide ample evidence of the mechanisms in place reasonably to prevent inmate assaults.  Defendants were entitled to use the detectors on a discretionary basis, pursuant to the regulations, and relied on the training for random pat frisks, and extensive searches of the recreation yard to alleviate such weapons threats.  Defendants also employed the use of multiple guards patrolling the yard and escorting prisoners, having armed guards in watch towers, and having recording equipment and surveillance operating throughout the day.  "While the system in place at [Auburn] may not be infallible, no

17

reasonable factfinder could conclude on this record that Defendants disregarded an excessive risk to plaintiff's safety by failing to adopt plaintiff's proposed security measures," of having mandatory metal detection upon entry and exit of the recreation yard.  Warren II, 579 F. Supp. 2d at 497 (internal quotation marks and citations omitted).

Furthermore, even if pursuing these security measures are deemed wrong or, at worst, negligent, this still does not rise to the level of deliberate indifference actionable under the Eighth Amendment.  See Farmer, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment."); Warren II, 579 F. Supp. 2d at 496 (holding that "even if a prison official is aware of a risk, he may be found free of liability if he responded reasonably to the risk, even if the harm ultimately was not averted.") (internal quotation marks and citations omitted).  Accordingly, even if defendants were negligent in failing to staff the yard with more people or subject more individuals to metal detection searches, such staffing shortcomings could not serve as a basis for constitutional relief.  See Matthews, 36 F. Supp. 2d at 126 ("Additional precautions might have prevented the stabbing here, but the failure to institute such precautions at most constituted negligence.").

Therefore, defendants' motion should be granted on this ground.


### E. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity.  Qualified immunity generally protects government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

18

would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982); <u>Aiken v. Nixon</u>, 236 F.

Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), <u>aff'd</u>, 80 Fed.Appx. 146 (2d Cir. Nov.

10, 2003).  However, even if the constitutional privileges "are so clearly defined that a

reasonable public official would know that his actions might violate those rights ... immunity

might still be available as a bar to ... suit if it was objectively reasonable for the public official

to believe that his acts did not violate those rights." <u>Kaminsky v. Rosenblum</u>, 929 F.2d 922,

925 (2d Cir.1991) (citations omitted).

A court must first determine whether, if plaintiff's allegations are accepted as true, there

would be a constitutional violation.  <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).  Only if there

is a constitutional violation does a court proceed to determine whether the constitutional

rights, of which a reasonable person would have known, were clearly established at the

time of the alleged violation. <u>Aiken</u>, 236 F. Supp. 2d at 230.  As discussed <u>supra</u>, there

have been no questions of fact raised as to Sullivan's claims and, therefore, the second

prong need not be addressed.

Moreover, even if it could be said that Sullivan has shown an Eighth Amendment

violation, such a violation is defeated by qualified immunity.  As previously discussed,

defendants acted reasonably in not running the metal detector and relying on routine,

random searches of the inmates in the yard given that (1) there was no previously identified

risk of harm to Sullivan by any of these inmates; (2) defendants already employed many

safety procedures with searching the recreation yard, observing the inmates, and randomly

searching the inmates during recreation times; (3) requiring such metal detection is cost

prohibitive; (4) placing a machine by the entryway would lead to inconclusive results due to

all the surrounding steel; and (5) requiring inmates to be herded through a single entrance,

instead of six, may pose an even greater safety risk.

In the alternative, therefore, defendants' motion should be granted on this ground.

### III.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 33) be **GRANTED** and that judgment be entered for all defendants on all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation." N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:  August 5, 2011
      Albany, New York

David R. Homer
United States Magistrate Judge